UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MATTHEW S. JENKINS, | ) | CASE NO. 1:16CV1322 |
| | ) | |
| Plaintiff, | ) | JUDGE SARA LIOI |
| | ) | |
| v. | ) | Magistrate Judge George J. Limbert |
| | ) | |
| NANCY A. BERRYHILL[1], | ) | |
| ACTING COMMISSIONER OF | ) | REPORT AND RECOMMENDATION |
| SOCIAL SECURITY, | ) | OF MAGISTRATE JUDGE |
| | ) | |
| Defendant. | ) | |
| | ) | |

Plaintiff Matthew S. Jenkins ("Plaintiff") requests judicial review of the final decision of the Commissioner of Social Security ("Defendant") denying his application for Supplemental Security Income ("SSI"). ECF Dkt. #1. In his brief on the merits, filed on September 10, 2016, Plaintiff asserts that the administrative law judge's ("ALJ") decision: (1) violated that treating physician rule; and (2) is not supported by substantial evidence. ECF Dkt. #13. Defendant filed a response brief on November 10, 2016. ECF Dkt. #15. On December 6, 2016, Plaintiff filed a reply brief. ECF Dkt. #17.

For the following reasons, the undersigned RECOMMENDS that the Court AFFIRM the ALJ's decision and dismiss Plaintiff's case in its entirety with prejudice.

## I.     PROCEDURAL HISTORY

On May 10, 2013, Plaintiff protectively filed an application for SSI alleging disability beginning February 1, 2011. ECF Dkt. #12 ("Tr.") at 12.[2] Plaintiff's claim was denied initially

---

[1]On January 23, 2017, Nancy A. Berryhill became the acting Commissioner of Social Security, replacing Carolyn W. Colvin.

[2]All citations to the Transcript refer to the page numbers assigned when the Transcript was filed as a .PDF, rather that the page numbers assigned by the CM/ECF system. When the Transcript was filed the .PDF included an index, with the indexed pages differentiated from the numerical pages. Accordingly, the page number assigned in the .PDF mirrors the page printed on each page of the Transcript, rather than the page number assigned when the Transcript was filed in the CM/ECF system.

and upon reconsideration.  *Id.*  Following the denial of her claim, Plaintiff requested a hearing.  *Id.*  A hearing was held on December 10, 2014, during which the ALJ told Plaintiff that it may be in his best interest to find legal representation, and Plaintiff agreed.  *Id.* at 55, 59.  Accordingly, a second hearing was held on April 16, 2015, after Plaintiff had obtained legal representation.  *Id.* at 32.  On June 5, 2015, the ALJ issued a decision denying Plaintiff's claim.  *Id.* at 9.  Subsequently, the Appeals Council denied Plaintiff's request for review.  *Id.* at 1.  Accordingly, the June 5, 2015, decision issued by the ALJ stands as the final decision.

Plaintiff filed the instant suit seeking review of the ALJ's June 5, 2015, decision on June 1, 2016.  ECF Dkt. #1.  On September 10, 2016, Plaintiff filed a brief on the merits.  ECF Dkt. #13.  Defendant filed a response brief on November 10, 2016.  ECF Dkt. #15.  On December 6, 2016, Plaintiff filed a reply brief.  ECF Dkt. #17.

## II.     RELEVANT MEDICAL AND TESTIMONIAL EVIDENCE

### A.     Medical Evidence

In September 2011, Plaintiff was seen by Premal Pawti, M.D., for a psychiatric assessment, during which he reported that he did not like to be around others, had dreams of killing his friends, and was hearing voices.  Tr. at 394.  Plaintiff stated that his anxiety and depression were lifelong problems, and that his depression had worsened since his mother passed two years prior.  *Id.*  Continuing, Plaintiff reported hearing voices on an almost daily basis telling him that he was "not good" and to hurt others.  *Id.*  Plaintiff indicated that he began drinking at the age of fifteen, had been drinking heavily "lately," was drinking two to three times per week, drank thirty beers in one sitting, and that he experienced withdrawal symptoms including irritability, headaches, and severe anxiety.  *Id.*  Additionally, Plaintiff stated that he smoked one to two packs of cigarettes per day, and that he had been drinking forty-eight cans of Mountain Dew per day for the previous two to three years.  *Id.*  Plaintiff was told to stop using alcohol and to reduce his caffeine use, and was prescribed anti-depressant and anti-psychotic medications.  *Id.*  Further, Plaintiff was diagnosed with schizophrenia (paranoid type) and assessed a global assessment of functioning ("GAF") score of thirty-five.  *Id.* at 395.

On November 3, 2011, Plaintiff indicated that he had stopped taking his medications, because the medications made him "angry and mean." Tr. at 393. Plaintiff also reported hearing more voices, which were mean in nature, and increased paranoia. *Id.* In addition, Plaintiff stated that he cut down his alcohol use from twenty-four beers per day to a "couple of beers at a time," and that he was feeling shaky and experiencing withdrawal symptoms. *Id.* A GAF score of thirty-five was assigned to Plaintiff and he was prescribed Seroquel XR. *Id.*

On November 16, 2011, Plaintiff indicated that the Seroquel XR caused him to sleep more and feel numb. *Id.* at 392. Plaintiff reported: tiredness during the daytime; low appetite; low motivation; low interest; suspiciousness towards others; difficulty going new places or facing new people; and thoughts of cutting himself. *Id.* On examination, Plaintiff: was alert, awake, and oriented; displayed fair eye contact and normal speech; showed a thought process that was linear, logical, and goal-directed; presented a stable affect that was congruent with mood; and displayed fair attention, concentration, and memory. *Id.* It was noted that Plaintiff responded well to Seroquel, despite being drowsy, and a lower dosage of Seroquel was prescribed. *Id.* Plaintiff was also assigned a GAF score of forty. *Id.* On November 23, 2011, Plaintiff reported that he was sleeping "better," and for about seven to eight hours per night. Tr. at 391. Plaintiff stated that his auditory hallucinations had decreased in frequency, although he was still suspicious of others and had difficulty going out in public. *Id.* Accordingly, Plaintiff was prescribed Zoloft for depression and Vistaril for anxiety. *Id.* On November 29, 2011, Plaintiff reported that his anxiety was better, but that he was still depressed. Tr. at 389. Plaintiff reported sleeping four to five hours per night, and that the Vistaril was helping his anxiety. *Id.* Accordingly, Plaintiff's dosage of Seroquel XR was reduced, and he was continued on Zoloft and Vistaril. *Id.* Plaintiff was assigned a GAF score of forty-five. *Id.*

On November 30, 2011, Plaintiff visited a community counseling center for his alcohol dependence. Tr. at 387. Plaintiff reported that he: lived in an apartment with a cousin and four friends; did not like people since "they act too friendly"; normally drank alone; would begin drinking at a bar then went home and continued drinking; typically began drinking at 9:00 P.M. and continued until 9:00 A.M.; had used Vicodin for about three weeks when he could not afford

alcohol; normally drank a "[thirty] pack" of beer per day; liked drinking at bars because others would pay for his drinks; became more depressed and irritable when drinking; and found a social benefit in drinking insofar as he was able to associate with friends who were alcoholics. *Id.* Continuing, Plaintiff stated that he had not used alcohol in three weeks, which caused anxiety when first stopping, and that he did not plan on using alcohol in the future. *Id.*

In December 2011, Plaintiff had exhausted his supply of Seroquel XR after his insurance stopped covering the cost of the medication. Tr. at 386. Plaintiff reported that this medication had helped control his hallucinations and paranoia, but that he was still experiencing depressive episodes. *Id.* According to Plaintiff, he was sleeping six to eight hours per night. *Id.* A GAF score of forty-five was assigned to Plaintiff. *Id.* On January, 23, 2012, Plaintiff reported that he was no longer feeling drowsy during the daytime after switching from Seroquel to Seroquel XR, but continued to experience auditory hallucinations and anxiety. *Id.* at 415. In early February 2012, Plaintiff indicated that he was "doing better," as his symptoms were improving and he was sleeping six to eight hours per night. *Id.* at 414. On March 8, 2012, Plaintiff reported that he had been off his medications for seven to ten days, and that he had started noticing auditory and visual hallucinations, as well as increased depression and anxiety, since he had stopped taking his medications. Tr. at 556. After restarting his medication regimen, on March 22, 2012, Plaintiff stated that he was "doing much better," and was experiencing decreased hallucinations, depression, and anxiety. *Id.* at 555.

On April 5, 2012, Plaintiff visited Timothy Hicks, P.C.C., and indicated that his cousin and two of the friends that he lived with had moved out, and that he continued to have cravings for alcohol, which increased his anxiety. *Id.* at 553. Plaintiff reported that his anger was "somewhat manageable," and that his level of depression fluctuated on a daily basis. *Id.* Continuing, Plaintiff explained that on good days he would clean his house and then go visit with friends, and on bad days he thought "why should I get up." *Id.* On April 22, 2012, Plaintiff again reported that he was "doing better," and that he was sleeping about five hours per night and had a good appetite. *Id.* at 551.

Plaintiff had an initial therapy session with Howard Loftus, B.S., P.C., on September 20, 2013, where it was noted that he was fidgety, displayed social anxiety, and experienced visual and auditory hallucinations. Tr. at 523. On September 20, 2013, Plaintiff began treatment with Peter G. Kontos, D.O.[3] *Id.* at 525. Dr. Kontos diagnosed Plaintiff with: schizoaffective disorder (depressive type); depressive disorder (not otherwise specified, chronic atypical); generalized anxiety disorder (moderate to severe degree, obsessive compulsive disorder); cognitive deficits (minimal degree); and learning disorder (not otherwise specified). *Id.* at 529. Plaintiff was assigned a GAF score of forty-seven. *Id.* On October 16, 2013, Plaintiff reported: sleeping one and a half hours per night; eating once a day; "doing a bit better in mood and anxiety"; having difficulty facing people with feelings of panic; and difficulty going to stores and wanting to leave due to panic. *Id.* at 531. Dr. Kontos concluded that Plaintiff's mood, depression, and anxiety had improved slightly, but that he was still having difficulty facing people due to thoughts that they were watching him. *Id.* at 533. It was also noted that Plaintiff was compliant with his medications. *Id.* Plaintiff was assigned a GAF score of forty-seven to forty-eight. *Id.* In November 2013, Dr. Kontos stated that Plaintiff: was still bothered by isolation and anhedonia; stayed up most of the night and slept from 7:00 A.M. to the late afternoon due to chronic sleep reversal; had low energy levels; was slightly disheveled with decreased eye contact; displayed spasms in his right leg; and was bothered by memory and inattention. Tr. at 535-36.

In January 2014, Plaintiff told Dr. Kontos that he had not slept in four days and that he was eating one meal per day. Tr. at 660. Dr. Kontos attempted some grief interventions, but was without success. *Id.* In February 2014, Plaintiff appeared disheveled with a "fretful facial appearance," and Dr. Kontos adjusted Plaintiff's medication regimen. *Id.* at 651. In May 2014, Plaintiff reported bad dreams, and Dr. Kontos noted that he continued with a "periodic persistent moderate degree of anxiety social avoidance, depression, irritability, and generalized anger when he is out in public." *Id.* at 643. Plaintiff reported difficulty with violent vivid dreams in July

---

[3]Dr. Kontos' opinion is the opinion upon which Plaintiff relies when asserting that the ALJ violated the treating physician rule. *See* ECF Dkt. #13 at 1, 19-23.

2014, as well as thoughts that scare him such as thoughts of killing his family violently. *Id.* at 637-38. Dr. Kontos noted that Plaintiff was sleeping better, but was still struggling with social anxiety, even isolating himself from the friends with which he lived. *Id.* at 637. Continuing, Dr. Kontos indicated that he encouraged Plaintiff to develop new contacts, exercise, and engage in activities outside of the home. *Id.* at 638. Dr. Kontos also mentioned that Plaintiff had training in computer programming and repair, and that he had held a job in this area in the past, albeit for a short time. *Id.*

Plaintiff reported that he was "not too good the past three days," and that he was not as angry towards others or when out in public in August 2014. Tr. at 632. Dr. Kontos concluded that Plaintiff's persistent chronic depression continued, as did his chronic moderate anxiety and paranoid ideation. *Id.* at 634. Further, Dr. Kontos noted that Plaintiff was beginning to relapse as he was off his medication, and adjusted his medications. *Id.* In October 2014, Dr. Kontos indicated that Plaintiff had increased levels of panic when he went out with family and friends. *Id.* at 618. Plaintiff reported "not doing too well" insofar as his depression and memory were concerned. *Id.* at 619. Additionally, Plaintiff reported continued paranoia and anxiety. *Id.* On examination, Plaintiff displayed an anxious and depressed mood, but was well oriented with a clear sensorium. *Id.* at 620. Plaintiff was assigned a GAF score of forty-seven. *Id.* Dr. Kontos felt that Plaintiff was regressing and experiencing worsened symptoms of depression due to his inability to function coupled with his suspiciousness of others and additional stressors, including the upcoming birthday of his late mother. *Id.* at 621.

In December 2014, Plaintiff told Dr. Kontos that he tried a Xanax after having an anxiety attack when he went to a party with his cousin. Tr. at 609. Plaintiff stated that the Xanax helped ease his anxiety, and that it was "a bit easier" to attend the party, at which there were fifty to sixty people. *Id.* Plaintiff reported that he was sleeping for about five hours each night. *Id.* On examination, Plaintiff was alert, minimally disheveled, cooperative, and well oriented with a clear sensorium. *Id.* Dr. Kontos noted that Plaintiff's mood was moderately anxious with underlying frustration and mild to moderate depressive features with low resonance of affect, but partially congruent. *Id.* Plaintiff's thoughts were ruminative and obsessed with fear, avoidance,

and underlying suspicious trends, but no overt delusional mentation or hallucinations. *Id.* It was also noted that Plaintiff was mildly inattentive with cognitive rigidity. *Id.* Dr. Kontos indicated that Plaintiff continued to experience chronic anxiety that increased when he left his house. *Id.* at 610. Plaintiff stated that he would like to "at least be able to go to the store," and that he had gone with friends to the mall but was unable to enter the mall, noting that he felt like "the building was so small and there were so many people there." *Id.* Dr. Kontos also indicated that, despite the improvement in Plaintiff's sleep patterns, he continued to isolate in his room. *Id.*

Plaintiff returned to Dr. Kontos' office in January 2015, reporting that he was "not doing well," and that he had not left his house since his last appointment, except to meet his attorney. Tr. at 596. Continuing, Plaintiff stated that he tried to go to the pharmacy, but became nauseated and vomited, resulting in the driver needing to pull the vehicle over. *Id.* at 597. Plaintiff indicated that he was having anxiety attacks that made it hard for him to concentrate. *Id.* Further, a nurse had to stop Plaintiff from leaving Dr. Kontos' waiting room prior to his appointment due to anxiety. *Id.* Dr. Kontos assessed Plaintiff as displaying increased depression, withdrawn mood, and low motivation, and assigned a GAF score of forty-seven. *Id.* at 600. Plaintiff told Dr. Kontos that he knew how to repair, fix, update, and program computers. *Id.* at 598. Continuing, Plaintiff indicated that he had been told at his job at Best Buy that he had excellent repair and troubleshooting skills, but needed to improve his social skills. *Id.* Plaintiff also mentioned talking with a friend that owned a pawn shop who suggested that Plaintiff repair old computers for the shop. *Id.*

On March 19, 2015, Plaintiff told Dr. Kontos that: he was nervous and experiencing anxiety; he felt that he was going to vomit due to all of the people at Dr. Kontos' office; smoking a few cigarettes did not relax him despite it typically being relaxing; he was having difficulties walking his dog due to anxiety; he was forgetful and having confusing thoughts; and he felt depressed. Tr. at 720. Less than a week later, Plaintiff reported that his medication was not controlling his anxiety, he felt awful, and that he had only left his house for a dentist appointment since the last visit to Dr. Kontos. *Id.* at 708. Dr. Kontos assigned a GAF score of forty-seven. *Id.* at 709. In April 2015, Plaintiff reported that his medication made him quick to

anger, whereas his attitude was typically "whatever." *Id.* at 697. At this visit, Dr. Kontos assigned a GAF score of fifty.

## **B.** **Opinion Evidence**

In June 2010, Richard C. Halas, M.A., a clinical psychologist, examined Plaintiff and provided an opinion as to his mental functioning. Tr. at 367. The opinion was based on a Mental Functional Capacity assessment, in which it was noted that Plaintiff was either moderately or markedly limited in all areas of understanding and memory, sustained concentration and persistence, social interaction, and adaptation. Tr. at 367-68. Plaintiff reported that he lived with his aunt and had not seen a psychologist or psychiatrist since the ninth grade. *Id.* at 369-70. It was noted that Plaintiff: arrived on time for the appointment; presented as disheveled and in a generally unkempt manner; displayed poor dress and below average grooming; had a high degree of cooperation and a high level of motivation; was rather hesitant and constricted; was neither impulsive nor compulsive; and understood the ramifications and the need for the appointment. *Id.* at 370. Plaintiff's responses during the examination were pressured and rambling, but he did not show any specific problems regarding fragmentation or flight of ideas. *Id.* Mr. Halas indicated that Plaintiff had: poor eye contact; a hard time maintaining normal levels of focus and eye contact; a good appetite and appeared to be adequately nourished, but not significantly overweight; and problems sleeping at night. *Id.* at 371. Plaintiff denied having problems with crying spells, displayed flat affect and depression, and admitted to feelings of helplessness, hopelessness, and worthlessness. *Id.*

Continuing, Mr. Halas indicated that Plaintiff generally showed high levels of anxiety, and seemed tense, anxious, and apprehensive, but not specifically phobic. Tr. at 371. Plaintiff did not show any specific problems with hallucinations, delusions, paranoid ideations, or misrepresentations. *Id.* Mr. Halas noted that Plaintiff did not appear to have any additional symptoms and/or characteristics that would be consistent with a thought disorder or psychotic process. *Id.* It was stated that Plaintiff's history reflected a lack of insight, limited social skills, and poor judgment. *Id.* at 372.

Next, Plaintiff described his activities of daily living. Tr. at 372. Plaintiff stated that he: woke most days around noon; gave food and water to his two dogs and let them outside; relied on his aunt to perform most of the household chores; did not watch television; had relatively few friends; did not attend church; did not drive and never obtained a driver's license; had the most fun spending time with his dogs; and liked role playing games and action movies. *Id.* When questioned as to the potential of long-term work, Plaintiff indicated that he was uncertain as to what kept him from working at that time other than "just not getting hired." *Id.* Personality testing showed that Plaintiff was confused and struggled with his personal identity. *Id.* at 371. Mr. Halas diagnosed generalized anxiety disorder, depressive disorder, and borderline intellectual functioning. Tr. at 373-74. A GAF score of forty-five was assigned to Plaintiff. *Id.* at 374.

On July 20, 2011, Michael W. Firmin, Ph.D., a psychiatrist, examined Plaintiff. Tr. at 378. When asked what kept him from entering the workforce, Plaintiff indicated that he did not feel well around others and that he felt like he "had to leave." *Id.* Plaintiff reported that he had been working full-time until his employment was terminated due to problems related to understanding what his boss expected and the speed of his work. *Id.* at 379-80. It was noted that Plaintiff had not experienced problems with the quality of the work, attendance, or disagreements with coworkers. *Id.* at 380.

Plaintiff was then examined by Dr. Firmin, who indicated that Plaintiff was dressed casually and appeared to have fair hygiene. Tr. at 380. It was noted that Plaintiff displayed: a pessimistic thought process; sad and anxious facial expressions; eye contact that was "staring"; a nervous and pessimistic mood; dsyphoric affect; poor appetite; insomnia, fatigue, low self-esteem; feelings of hopelessness; and below average intellectual functioning. *Id.* at 380-81. Plaintiff's ability to articulate and form clear thoughts was average. *Id.* at 381. Regarding his activities of daily living, Plaintiff reported he: could shop without the assistance of others; could handle money when shopping and could pay the right amount and count change; had friends over and used the phone to call family and friends; listened to music and watched television; used the computer; practiced hobbies; participated in physical exercise; never performed chores without

assistance; needed supervision when cooking and washing dishes; had others drive him where he needed to go; and did puzzles (crosswords, word finds, or Sudoku). *Id.*

Continuing, Dr. Firmin stated that Plaintiff reported having a learning disability when in school due to his reading level, however, Dr. Firmin then indicated that Plaintiff was able to read the questionnaire independently on the computer with minimal assistance of the office manager. Tr. at 382. Accordingly, Dr. Firmin deferred diagnosing a learning disorder, stating that if Plaintiff possessed a reading problem, he was unsure whether the severity warranted a learning disability diagnosis. *Id.* Dr. Firmin diagnosed social phobia (generalized), depressive disorder, and alcohol dependence, and assigned a GAF score of fifty-five. *Id.* at 382. Further, Dr. Firmin opined that Plaintiff seemingly possessed some deficits in his ability to learn job-related-tasks, but had the ability to apply reasoning skills in reality-based situations. *Id.* at 383. Dr. Firmin also stated that Plaintiff's intellectual abilities give rise to the potential that he could forget instructions from one day to the next, and that he had substantial difficulty connecting with others. *Id.* Finally, Dr. Firmin indicated that Plaintiff's capacity for handling workplace stress appeared to be "somewhat deficient." *Id.* at 384.

In May 2012, Plaintiff was again examined by Mr. Halas. Tr. at 444. Plaintiff reported that his most recent employment was as a "sander," but that he was terminated for being "too slow." *Id.* at 445. Mr. Halas noted that Plaintiff: was casually dressed; presented himself in a reasonably neat and generally well-kempt manner; was cooperative, yet hesitant; presented as flat, hesitant, and anxious; displayed a slow, hesitant, and constricted speech pattern; showed no fragmentation of thought or flight of idea; had a significant poverty of speech; had poor eye contact; and showed a high level of anxiety. *Id* at 445-46. Continuing, Mr. Halas opined that Plaintiff's overall presentation was within normal limits. *Id.* at 446. Insofar as his activities of daily living, Plaintiff reported that he: woke around 11:00 A.M. and let his dog out, and then fed the dog; performed all of the household chores with his roommate; did not attend church; did not drive; had a few friends; liked playing with his dog for fun; no longer played video games or went online; and watched television. *Id.* at 447.

Mr. Halas tested Plaintiff's IQ, and assigned a full-scale score of seventy-nine. Tr. at 447. Following the examination, Mr. Halas diagnosed Plaintiff as having generalized anxiety disorder and borderline intellectual functioning, and assigned a GAF score of forty-five. *Id.* Mr. Halas opined that Plaintiff would have: some problems understanding, remembering, and carrying out instructions; little to no difficulty maintaining attention and concentration; significant problems responding appropriately to supervisors, coworkers, and the general public; and significant problems responding to work pressures in a work setting. *Id.* at 448-49. Finally, Mr. Halas opined that Plaintiff would not be able to manage funds in an appropriate, practical, and realistic manner as he had a history of drinking abusively, was not clean and sober for an extended period of time, and was not in a twelve-step program at that time. *Id.* at 449.

In July 2013, Jennifer Haaga, Psy.D., examined Plaintiff. Tr. at 505. Plaintiff reported that he had previously moved back home to take care of his mother until her death, but was living with a friend at the time of the appointment. Tr. at 506. Continuing, Plaintiff told Dr. Haaga that had been sober for one year. *Id.* When asked about his activities of daily living, Plaintiff stated that he: typically woke in the afternoon at variable times; spent his days doing nothing; was unable to "read that great"; lost interest quickly when watching television; cleaned his room if necessary; did not have bank accounts; managed his own finances; was good with numbers; used a computer sometimes; did not drive or have access to public transportation; and went to sleep at variable times. *Id.* at 507-508.

Dr. Haaga noted that Plaintiff was dressed appropriately in clean casual clothing, but that his hygiene was poor and he had significant body odor. Tr. at 508. Plaintiff was cooperative with Dr. Haaga, but made no eye contact, and demonstrated adequate motivation. *Id.* Dr. Haaga noted that Plaintiff's speech was one-hundred percent understandable, with a slowed rate of speech and monotonous rhythm, and that the "amount of speech was less than normal." *Id.* Plaintiff's thought processes were logical, organized, coherent, and goal directed. *Id.* Dr. Haaga indicated that Plaintiff's mood was depressed with blunted affect and his psychomotor activity was slowed. *Id.* No motor manifestations of anxiety were observed at the examination, but Plaintiff reported feeling like his "heart was going to explode" when he attended a festival

with a friend.  *Id.*  Dr. Haaga noted that Plaintiff did not appear to be responding to internal stimuli, but stated that he experienced hallucinations such as shapes and floors moving, and walls breathing.  *Id.* at 508-509.

Next, Dr. Haaga indicated that Plaintiff appeared to have adequate common sense, reasoning, judgment, and insight into his current situation.  *Id.* at 509.  Continuing, Dr. Haaga opined that Plaintiff appeared to be cognitively and psychologically capable of living independently, making decisions about his future, and seeking appropriate services in the community.  *Id.*  Dr. Haaga diagnosed Plaintiff with social phobia, anxiety disorder (not otherwise specified), mood disorder (not otherwise specified), and alcohol abuse, and assigned a GAF score of forty.  *Id.* at 509-10.  In conclusion, Dr. Haaga opined that Plaintiff: was capable of comprehending and completing simple, routine tasks, but would have difficulties understanding, remembering, and following more detailed instructions; would have difficulty maintaining attention and concentration in work situation; had a history of interpersonal problems with supervisors and coworkers; and would likely have an increase in depressive and anxious symptoms when faced with stressors.  *Id.* at 510-11.

In September 2013, Kristen Haskins, Psy.D., a reviewing state agency psychologist, reviewed Plaintiff's file, found him to be fully cedible, and opined that he was capable of "simple, repetitive tasks with superficial interaction with others in settings where duties are relatively static and changes can be explained and that do not need close sustained focus/attention or sustained fast pace."  Tr. at 76.  On January 28, 2014, Aracelis Rivera, Psy.D., a reviewing state agency psychologist, reviewed Plaintiff's file, found him to be partially credible due to his statements regarding physical limitations that were not supported by the evidence, and affirmed the findings of Dr. Haskins.  *Id.* at 92.

In March 2015, Dr. Kontos issued an opinion on Plaintiff's ability to perform work-related activities.  Tr. at 681.  Dr. Kontos found that Plaintiff had marked limitations in his personal habits and his ability to understand, carry out, and remember instructions.  *Id.* Continuing, Dr. Kontos determined that Plaintiff had extreme limitations in his ability to: relate to others; attend meetings and socialize with friends/neighbors; maintain concentration and

attention for extended periods; sustain a routine without special supervision; perform activities within a schedule; maintain regular attendance; be punctual; respond appropriately to supervisors and coworkers; respond to customary work pressure; respond appropriately to changes in the work setting; and behave in an emotionally stable manner. *Id.* at 681-82. Dr. Kontos opined that Plaintiff would be absent from work more than three days per month. *Id.* at 682.

Additionally, Dr. Kontos issued an opinion concerning Plaintiff's schizoaffective disorder. Tr. at 683. Dr. Kontos assessed marked limitations in Plaintiff ability to: remember locations and work-like procedures; carry out very short and simple instructions; sustain an ordinary routine without special supervision; make simple work-related decisions; maintain socially appropriate behavior; and adhere to basic standards of neatness and cleanliness. *Id.* Further, Dr. Kontos assessed extreme limitations in Plaintiff's ability to: carry out detailed instructions, maintain attention and concentration for extended periods; perform activities within a schedule; work in proximity to others without being distracted by them; make simple work-related decisions; complete a normal workday; interact appropriately with the general public; accept instructions and respond to criticism from supervisors; get along with coworkers; respond appropriately to changes in the workplace; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently. *Id.* at 684.

### C. Testimonial Evidence

Plaintiff's hearing was originally set for December 10, 2014, but was rescheduled for April 16, 2015, after Plaintiff indicated that he wished to find an attorney to represent him in this matter. Tr. at 32, 55-60. At the April 16, 2015, hearing, Plaintiff was represented by counsel. *Id.* at 39. The ALJ began by giving a brief opening statement explaining the hearing procedure, and then examined Plaintiff. *Id.* at 34-36. When asked about his living situation, Plaintiff testified that he lived with friends in apartment and that his friends paid the bills using their Social Security benefits. *Id.* at 37. Plaintiff stated that he did not have a driver's license and that he had never tried to obtain his license as he had been in a car accident as a child. *Id.* at 38. Continuing, Plaintiff indicated that he dropped out of high school in ninth or tenth grade and that he failed his GED examination, but also noted that he did not take a class or preparation course

prior to the examination. *Id.* at 39. Plaintiff testified that he had performed one month of full-time work in his life, and that the job ended, but he was never told why he was fired. *Id.*

When asked what prevented him from working, Plaintiff indicated that he had "real bad anxiety around new people" and that he had "problems trying to do what people asked of [him] because [he got] confused." Tr. at 41. Plaintiff stated that he was taking medications, but could not recall the names of the medications. *Id.* The ALJ then asked Plaintiff to describe a typical day. *Id.* at 42. Plaintiff stated that he took his husky outside and sometimes used the computer. *Id.* When asked about his computer skills, Plaintiff stated that he would not describe his skills as "excellent," and that he tried to fix computers. *Id.* at 43. Plaintiff indicated that he smoked about one pack of cigarettes per day, but was trying to quit. *Id.* Continuing, Plaintiff testified that he no longer drank alcohol and that he had quit drinking about two years prior to the hearing. *Id.* Plaintiff denied recreational drug use, and stated that he had noticed a slight improvement in his mental health issues since he began taking his medications. *Id.* at 44. The ALJ then concluded the questioning.

Next, Plaintiff was examined by his attorney. Tr. at 44. Plaintiff testified that he stayed in his house between appointments, and that his medication caused drowsiness and fatigue. *Id.* at 44-45. Continuing, Plaintiff stated that he could not write "very well" and that he had difficulty reading. *Id.* at 45. Plaintiff stated that he experienced anxiety attacks and panic attacks, and that these attacks occurred three to four times per month. *Id.* When questioned about his daily activities, Plaintiff testified that he had experienced a loss of interest in activities such as playing video games and going outside. *Id.* at 46. Plaintiff stated that he no longer had any interest in repairing computers. *Id.* When asked about the possibility of repairing and selling computers at his friend's pawn shop, Plaintiff indicated that he had told his friend that he "would try," but then his friend never contacted him about the job again. *Id.* at 47.

Plaintiff then testified that he had experienced a change in his appetite and only ate one meal per day, which he sometimes prepared himself. Tr. at 47. According to Plaintiff, when he prepared his own meals, he typically prepared something that could be cooked in the microwave. *Id.* Plaintiff testified that his sleep was "[n]ot so great," and that he typically slept two to four

hours per night. *Id.* at 48. Continuing, Plaintiff stated that he had difficulty concentrating. *Id.* Plaintiff also stated that he was paranoid and felt like either everyone was out to harm him or that he may harm others. *Id.* When asked about socialization, Plaintiff indicated that he only socialized with the people with which he lived. *Id.* Plaintiff stated that there were days where he did not dress himself or shower, and that he changed his clothes every other day. *Id.* at 48-49.

Following Plaintiff's testimony, the ALJ examined a vocational expert ("VE"). Tr. at 50. The VE was asked to consider an individual of Plaintiff's age and with Plaintiff's education, with the past job of finish sander, and who had the following non-exertional limitations: understand, remember, and carry out simple, routine tasks; make simple work-related decisions; perform work that did not require satisfaction of production quotas; work in an environment with only occasional changes in the work setting; and only occasional superficial interactions with supervisors, co-workers, and the general public. *Id.* at 51-52. The VE testified that such an individual could not perform Plaintiff's past work as a sander, but that other jobs were available for an individual with the limitations described above. *Id.* As examples, the VE offered the jobs of laundry laborer, order puller, and kitchen helper. *Id.* The ALJ then asked the VE whether his answers would change if this individual was off-task twenty percent of the time, or would be absent more than three times per month. *Id.* at 53. The VE stated that no work would be available if either of these additional limitations were added. *Id.* Following the testimony offered by the VE, the ALJ concluded the hearing. *Id.* at 54.

## III.  RELEVANT PORTIONS OF THE ALJ'S DECISION

Following the hearing held on April 16, 2015, the ALJ issued a decision on June 5, 2015. Tr. at 9. The ALJ found that Plaintiff had not engaged in substantial gainful activity since May 10, 2013, the date of his application. *Id.* at 14. Continuing, the ALJ determined that Plaintiff had the following severe impairments: schizoaffective disorder (depressive), depression, generalized anxiety disorder, and obsessive-compulsive disorder. *Id.* The ALJ then found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* at 16.

Next, the ALJ found that Plaintiff had mild restriction in activities of daily living, noting that he: took care of his dog; used a computer; prepared meals in the microwave; washed laundry; paid bills; counted change; watched television; attended appointments; shopped in stores for food; handled a savings account; and used a checkbook and money orders. Tr. at 16. The ALJ also noted that Plaintiff reported that he knew how to repair, update, and program computers.[4] *Id.* In social functioning, the ALJ found mild difficulties, and stated that Plaintiff: isolated himself in his bedroom and rarely left his apartment; played games with others; saw his cousin; maintained friendships; showed a capacity for positive and appropriate social action, as described by practitioners; and went out in the community to attend medical appointments and shop. *Id.* The ALJ found moderate difficulties in concentration, persistence, or pace. Specifically, the ALJ indicated that Plaintiff reported difficulty with concentration and completing tasks, yet was able to: care for his dog; use a computer; prepare meals; perform personal care tasks; wash laundry; attend appointments; and play card games. *Id.* The ALJ also noted that Plaintiff had not experienced any episodes of decompensation, of extended duration. *Id.* at 17.

After consideration of the record, that ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, with the following non-exertional limitations: understanding, remembering, and carrying out simple, routine tasks; making simple work-related decisions; performing work that did not require satisfaction of production quotas; only occasional changes in the work setting; and only occasional superficial interactions with supervisors, co-workers, and the general public. Tr. at 17.

Next, the ALJ determined that Plaintiff was unable to perform any past relevant work. *Id.* at 23. The ALJ stated that Plaintiff was a younger individual, had a limited education and was able to communicate in English, and that the transferability of job skills was not an issue in this case because Plaintiff's past relevant work was unskilled. *Id.* Considering Plaintiff's age, education, work experience, and RFC, the ALJ found that there were jobs that existed in

---

[4]The ALJ discussed Plaintiff's daily activities again later in the decision, adding the Plaintiff: mowed the grass; rode his bicycle; and cleaned the gutters. Tr. at 20.

significant numbers in the national economy that Plaintiff could perform.  Tr. at 24.  Finally, the

ALJ determined that Plaintiff had not been under a disability, as defined in the Social Security

Act, since May 10, 2013, the date his application was filed.  *Id.*

## IV.    STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to

social security benefits.  These steps are:

1.    An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2.    An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3.    If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see  20 C.F.R.  § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4.    If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5.    If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992).  The claimant has the burden to go forward

with the evidence in the first four steps and the Commissioner has the burden in the fifth step.

*Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## V.    STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and

makes a determination of disability.  This Court's review of such a determination is limited in

scope by §205 of the Act, which states that the "findings of the Commissioner of Social Security

as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. §405(g).

Therefore, this Court's scope of review is limited to determining whether substantial evidence

supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937 (citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (internal citation omitted)). Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234 (6th Cir. 2007). Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the record upon which the ALJ could have found plaintiff disabled. The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001). However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted).

## VI.  LAW AND ANALYSIS

### A.  Treating Physician Rule

Plaintiff first asserts that the ALJ's handling of treating psychiatrist Peter G. Kontos' medical opinion violated the treating physician rule.[5]  ECF Dkt. #13 at 19. An ALJ must give controlling weight to the opinion of a treating source if the ALJ finds that the opinion is well-supported by medically acceptable clinical and diagnostic techniques and not inconsistent with

---

[5]Plaintiff indicates that Dr. Kontos issued two opinions. ECF Dkt. #13 at 20. Dr. Kontos did issue an Assessment of Ability to Do Work-Related Activities (Mental) and a Medical Statement Concerning Schizoaffective Disorder. Tr. at 681. Both of these documents were prepared on March 19, 2015, and contain overlapping information. *See* Tr. at 681-84. Further, the ALJ considered these documents jointly as one opinion. Tr. at 21-22. Since both documents were prepared on the same date and for the purpose of consistency in the record, the undersigned refers to both the Assessment of Ability to Do Work-Related Activities (Mental) and the Medical Statement Concerning Schizoaffective Disorder, both completed on March 19, 2015, as one opinion.

the other substantial evidence in the record. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). If an ALJ decides to discount or reject a treating physician's opinion, he or she must provide "good reasons" for doing so. Social Security Rule ("SSR") 96-2p. The ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* This allows a claimant to understand how his case is determined, especially when he knows that his treating physician has deemed him disabled and he may therefore "be bewildered when told by an administrative bureaucracy that he is not, unless some reason for the agency's decision is supplied." *Wilson,* 378 F.3d at 544 (quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)). Further, it "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Id.* If an ALJ fails to explain why he or she rejected or discounted the opinions and how those reasons affected the weight afforded to the opinions, this Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be justified based upon the record." *Rogers,* 486 F.3d at 243 (citing *Wilson*, 378 F.3d at 544).

The Sixth Circuit has noted that, "while it is true that a lack of compatibility with other record evidence is germane to the weight of a treating physician's opinion, an ALJ cannot simply invoke the criteria set forth in the regulations if doing so would not be 'sufficiently specific' to meet the goals of the 'good reason' rule." *Friend v. Comm'r of Soc. Sec.*, 375 Fed.Appx. 543, 551 (6th Cir. 2010). The Sixth Circuit has held that an ALJ's failure to identify the reasons for discounting opinions, "and for explaining precisely how those reasons affected the weight" given "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Parks v. Social Sec. Admin.*, 413 Fed.Appx. 856, 864 (6th Cir. 2011) (quoting *Rogers*, 486 F.3d at 243 ). However, an ALJ need not discuss every piece of evidence in the administrative record so long as he or she considers all of a claimant's medically determinable impairments and the opinion is supported by substantial evidence. *See* 20 C.F.R. § 404.1545(a)(2); *see also Thacker v. Comm'r of Soc. Sec.*, 99 Fed.Appx. 661, 665 (6th Cir. 2004). Substantial evidence can be "less than a preponderance," but must be adequate for a reasonable

mind to accept the ALJ's conclusion. *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010) (citation omitted).

Plaintiff first indicates that the ALJ must grant controlling weight to a treating source's opinion if the opinion is: (1) well-supported by clinical and laboratory diagnostic techniques; and (2) not inconsistent with other substantial evidence in the administrative records. ECF Dkt. #13 at 19 (citing *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375-76 (2013)). Continuing, Plaintiff notes that if the Defendant does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, extent of the treatment relationship, the treating source's specialty, and the degree to which the opinion is consistent with the record as a whole. *Id.* at 20 (citing 20 C.F.R. §§ 404.1527(c)(2) and 416.926(c)(2)).

After the discussion of *Gayheart*, Plaintiff states that Dr. Kontos, the treating psychiatric, issued an opinion on March 19, 2015, about his mental functioning, and that the reasons provided by the ALJ for discounting the opinion did not constitute "good reasons" for assigning the opinion little weight. ECF Dkt. #13 at 20-21. Specifically, Plaintiff takes issue with the following three reasons provided by the ALJ for discounting the weight accorded to Dr. Kontos' opinion: (1) the opinion was in a checklist-style form that generally contained only conclusions; (2) the opinion was inconsistent with some of Dr. Kontos' own observations during treatment; and (3) the opinion was inconsistent with medical evidence indicating that Plaintiff possessed the "strong ability" to fix computers and knowledge of programming. *Id.* at 21-22. Additionally, Plaintiff asserts that the ALJ failed to assign any weight to the portions of Dr. Kontos' opinion regarding absenteeism and Listing 12.03C (schizophrenic, paranoid, and other psychotic disorders), and that these omissions were harmful to Plaintiff. *Id.* at 22-23. Plaintiff also claims that Dr. Kontos was the only physician to offer a medical opinion regarding absenteeism, and, as this portion of the opinion was uncontradicted, "that opinion is entitled to complete deference." *Id.* at 23 (citing *Cohen v. Sec'y of H.H.S.,* 964 F.2s 524 (6ᵗʰ Cir. 1992)). Defendant agrees that if controlling weight is not given to a treating physician's opinion, the ALJ determines the appropriate weight based on the factors provided in 20 C.F.R. § 416.927(c)(2), and contends that substantial evidence supports the ALJ's analysis of Dr. Kontos' opinion. ECF Dkt. #15 at 16-20.

The ALJ provided a number of reasons why she assigned little weight to the opinion of Dr. Kontos. Tr. at 21-22. First, the ALJ stated that Dr. Kontos "submitted a checklist-style form that generally contained only conclusions regarding functional limitations without any detailed rationale for those conclusions." *Id.* at 21. Plaintiff argues that the relevant issue is not the format of an opinion, but rather whether the opinion is supported by well-established clinical and diagnostic techniques and by the other substantial evidence in the record. ECF Dkt. #13 at 21. However, after stating that the issue is whether the opinion is supported by well-established clinical and diagnostic techniques and by the other substantial evidence in the record, Plaintiff fails to point to a single piece of evidence he believes supports the extreme limitations imposed in Dr. Kontos' opinion. *See id.* Additionally, while the undersigned recognizes Plaintiff's assertion that a medical source is not required to include all of the supporting evidence within the four corners of the opinion, Dr. Kontos' opinion consisted of four pages of checkbox-style forms devoid of an explanation or substantive basis for the extreme limitations opined. *See* Tr. at 681-84.

> Defendant correctly indicates that the regulations state:
>
> Supportability: The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight [will be given] to that medical opinion. The better an explanation a source provides for a medical opinion, the more weight [will be given to] that medical opinion.

ECF Dkt. #15 at 21 (citing 20 C.F.R. § 416.927(c)(3)). "Numerous courts have agree that the use of a checklist or check-the-box forms, where no explanation is provided for the limitations assessed, are unsupported and, therefore, need not be accepted even when completed by a treating source." *Langlois v. Colvin*, No. 3:15-CV-01682, 2016 WL 1752853, at *8 (N.D. Ohio May 3, 2016) (collecting cases). The undersigned recognizes that there are treatment records from Dr. Kontos, however, the ALJ's determination that the opinion did not provide detailed rationale for the conclusions is consistent with the regulations and governing caselaw.

The ALJ also indicated a second reason little weight was assigned to Dr. Kontos' opinion, namely:

> Dr. Kontos' opinion is inconsistent with some of his own observations during
> treatment, including that [Plaintiff] showed improvement in his level of anxiety
> and irritability with medication, had a reduction in anger reactivity at others, and
> was dealing better with his past violent thoughts.

Tr. at 21-22. Plaintiff indicates that Dr. Kontos' opinion specifically mentioned that medication only offered "partial to minimal improvement" of his symptoms, and that Dr. Kontos' treatment notes supported that assessment. ECF Dkt. #13 at 21. Additionally, Plaintiff states that the treatment notes establish that he is "a schizophrenic shut-in, incapable of completing his daily activities even on medication." *Id.*

Defendant responds by highlighting portions of the record she indicating that: in March 2012 and April 2012, Plaintiff noted that he was doing better, his mood was better, and his appetite was good; Dr. Kontos concluded that Plaintiff was less depressed in October 2013; Plaintiff stated that he was learning how to come out of his significant isolation and avoidance in November 2013; and, that same month, it was noted that Plaintiff's eye contact and speech had improved, and that he was beginning to feel an increase in motivation and energy. Tr. at 531, 533, 535-39, 551, 555. While portions of Dr. Kontos' treatment notes are consistent with his opinion that Plaintiff's medications resulted in partial to minimal improvements in his mental health, other portions, such as those cited by Defendant, are not consistent. The ALJ stated, "Dr. Kontos' opinion is inconsistent with some of his own observations during treatment." Tr. at 21. This statement is accurate as to Dr. Kontos' treatment notes as a whole.

The ALJ also stated that Dr. Kontos' opinion was inconsistent with medical evidence indicating that Plaintiff possessed a "strong ability" to fix computers, as well as knowledge of computer programming. Tr. at 22. Plaintiff asserts that the record contains a single reference to Plaintiff being interested in computers and being asked to repair a computer for a friend's pawn shop. ECF Dkt. #13 at 22 (citing Tr. at 598). Continuing, Plaintiff claims that this information is of little probative value since Plaintiff never attempted to work on computers, it was his friend's idea, and he only told his friend that he would "try." ECF Dkt. #13 at 22 (citing Tr. at 47). Further, Plaintiff indicates that the ALJ also omitted his friend's requirement that Plaintiff improve his social skills before working at the pawn shop. *Id.* (citing Tr. at 598). Defendant

contends that Plaintiff listed computers under the hobbies and interests section of his Function Report, and that he was encouraged to use his computer repair and programming skills by his medical providers and friends. ECF Dkt. #15 at 19 (citing 279, 598, 638).

Despite Plaintiff's contention otherwise, Dr. Kontos' treatment notes do show that Plaintiff has an interest in computers and at least some ability to perform repairs and program. Immediately after the discussion of repairing computer's at his friend's pawn shop, it is noted that Plaintiff worked briefly at a Best Buy in Erie, Pennsylvania, where he "was told that he had excellent skills as far as [the] repair of computers and troubleshooting," but needed to improve his social skills. Tr. at 598. Also, in addition to Plaintiff indicating that his hobbies and interests consisted of "computers," Plaintiff told Dr. Kontos that he knew how to repair computers, could fix and update computers, and knew how to program. *Id.* at 279, 598. Accordingly, the ALJ did not erroneously determine that Plaintiff's ability to fix and program computers was inconsistent with the extreme limitations imposed by Dr. Kontos. For the above stated reasons, Plaintiff has failed to demonstrate that the reasons offered by the ALJ for discounting Dr. Kontos' opinion did not constitute "good reasons."

After the discussion of whether the ALJ provided "good reasons" for discounting Dr. Kantos' opinion, Plaintiff claims that the ALJ failed to assign any weight to portions of the opinion. ECF Dkt. #13 at 22. Namely, Plaintiff asserts that the ALJ failed to address Dr. Kantos' opinion that he: (1) would be absent from work three or more times per month; and (2) met the requirements of Listing 12.03C (schizophrenic, paranoid, and other psychotic disorders).[6] *Id.*

Regarding Dr. Kontos' opinion as to absenteeism, Plaintiff asserts that Dr. Kontos was the only physician to offer a medical opinion regarding absenteeism, and, thus his opinion is entitled to complete deference. ECF Dkt. #13 at 23 (citing *Cohen v. Sec. Of H.H.S.*, 964 F.2d 524 (6th Cir. 1992). In *Cohen*, the Sixth Circuit explained:

---

[6]Plaintiff says little here regarding Listing 12.03C, only stating that the ALJ's failure to discuss Listing 12.03C was harmful. *See* ECF Dkt. #13 at 22-23. The ALJ's treatment of Listing 12.03C is further addressed in the next Section of the instant Report and Recommendation.

In determining whether a claimant is entitled to disability insurance payments, medical opinions and diagnoses of treating physicians are entitled to great weight, and, if uncontradicted, are entitled to complete deference. The ALJ, however, is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation.

964 F.2d 524, 528. Plaintiff's reliance on *Cohen* is misplaced. First, for the reasons described above, the ALJ properly discounted Dr. Kontos' opinion, assigning little weight to the opinion. Second, the checklist-style opinion submitted by Dr. Kantos presents conclusory statements unsupported by detailed objective criteria and documentation. Additionally, as it applies to both the absenteeism and the Listing 12.03C portions of Dr. Kontos' opinion, Plaintiff fails to state any reason why the ALJ was required to independently weigh each item contained in Dr. Kontos' opinion. For these reasons, the ALJ's decision not to assign weight to these specific portions of Dr. Kontos' opinion was not erroneous.

For the above stated reasons, the undersigned recommends that the Court find that the ALJ did not violate the treating physician rule.

**B.      Substantial Evidence**

Plaintiff next asserts that the ALJ's step three determination that he did not meet the requirements of Listing 12.03C is not supported by substantial evidence. ECF Dkt. #13 at 23. Continuing, Plaintiff claims that Dr. Kontos opined that he had a documented history of two or more years of an inability to function outside of a highly supportive living situation due to his schizoaffective disorder. *Id.* at 24. After reiterating that the ALJ did not address this portion of Dr. Kontos' opinion, Plaintiff claims that meaningful judicial review of Listing 12.03C is impossible because the ALJ did not cite to any relevant evidence in relation to the Listing. *Id.*

Defendant contends that while the ALJ did not address Listing 12.03C, she did address Listings 12.04 and 12.06, which contained the same requirement at issue here, namely, the inability to function outside a highly supportive living environment. ECF Dkt. #15 at 20 (citing Tr. at 17). Continuing, Defendant asserts that when discussing Listings 12.04 and 12.06, the ALJ held that there was no evidence that Plaintiff was unable to function outside a highly supportive living arrangement with an indication of the continued need for such an arrangement. *Id.* at 20-21 (citing Tr. at 17). Since the ALJ did discuss the lack of evidence demonstrating that

Plaintiff was unable to function outside a highly supportive living arrangement with an indication of the continued need for such an arrangement, any further discussion in the context of Listing 12.03C would have been duplicative. Additionally, Plaintiff relies entirely on Dr. Kontos' opinion to show that he satisfied Listing 12.03C, but the ALJ properly assigned less than controlling weight to Dr. Kontos' opinion. Further, Plaintiff omits any explanation as to why the ALJ should have reached a different conclusion regarding Listing 12.03C or explanation as to why he is unable to function outside a highly supportive living arrangement with an indication of the continued need for such an arrangement. Accordingly, the undersigned recommends that the Court find that the ALJ's decision is supported by substantial evidence.

**VII.** **CONCLUSION AND RECOMMENDATION**

For the foregoing reasons, the undersigned RECOMMENDS that the Court AFFIRM the ALJ's decision and dismiss Plaintiff's case in its entirety with prejudice.


Date: May 31, 2017                                      */s/George J. Limbert*
                                                GEORGE J. LIMBERT
                                                UNITED STATES MAGISTRATE JUDGE



ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice. Fed. R. Civ. P. 72; L.R. 72.3. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).